CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CHAD PENNINGTON
AYAH A. SARSOUR (Bar No. 340280)
(EMail: Ayah_Sarsour@fd.org)
Deputy Federal Public Defender
3801 University Avenue, Suite 700
Riverside, California 92501
Telephone: (951) 276-6346
Facsimile: (951) 276-6368

Attorneys for Defendant
JOSEPH BLANDON-SAAVEDRA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH BLANDON-SAAVEDRA<br><br>Defendant. | Case No. 5:25-cr-00310-KK-1<br><br>**SUPPLEMENT IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR FOR ALTERNATIVE REMEDIES DUE TO SPOLIATION OF THE EVIDENCE AND VIOLATION OF FED. R. CRIM. P. 16.**<br><br>**Hearing Time & Date:**<br>**November 10, 2025, at 10:00 a.m.** |

Defendant Joseph Blandon-Saavedra, by and through counsel of record, Deputy Federal Public Defenders, Ayah A. Sarsour and Chad Pennington hereby submits this supplemental brief in support of his request that the Court dismiss the indictment on the grounds that the government destroyed or failed to preserve exculpatory evidence, or, alternatively, that it destroyed or failed to preserve potentially useful evidence in bad faith. *See* ECF No. 55, Minute Order (providing that "[t]he parties may file supplemental briefing addressing issues raised by the Court by no later than [] November 12, 2025.").

This motion is made pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution, as well as *Brady v. Maryland*, 373 U.S. 83 (1963); *California v. Trombetta*, 467 U.S. 479 (1984); *Arizona v. Youngblood*, 488 U.S. 51 (1988); *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993); and *United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015).

As noted previously, Defendant's motion is supported by the accompanying Supplemental Memorandum of Points and Authorities and the offered exhibits, files, records, and declaration(s) in this case. The government, as of this filing, has not filed supplemental briefing on the defense's pending spoliation dismissal request. Accordingly, it has apparently waived any further argument on the motion.

Respectfully submitted,
CUAUHTEMOC ORTEGA
Federal Public Defender


DATED: November 12, 2025,

By /s/ *Ayah A. Sarsour*
AYAH A. SARSOUR
Deputy Federal Public Defender

By /s/ *Chad Pennington*
CHAD PENNINGTON
Deputy Federal Public Defender

## SUPPLEMETNAL MEMORANDUM OF POINTS AND AUTHORITIES

### I. Introduction & Background

The Court's Order granting accelerated briefing on the pending motion directed the government, in response, to include specific information. *See* ECF No. 46 at 2. The government's written response failed the Court's Order. And, at the November 10, 2025, oral argument on the instant motion, the government conceded it did not produce the evidence responsive to the Court's Order. November 10, 2025, Audio File II, at 2:30. The Court has tentatively ruled that dismissal of count two is an appropriate remedy in this matter given the presented spoliation issue and record. Mr. Blandon-Saavedra urges the Court to grant that remedy formally. Given the current record, trial on count two would be unfair and prejudicial to Mr. Blandon-Saavedra given the loss of the material exculpatory evidence and useful evidence, destroyed in the absence of good faith.

### The September 5, 2025, detention hearing

The centrality of the physical state of the autos named in the two counts was of obvious importance to the government from the inception of this case. The government claims Mr. Blandon-Saavedra struck the immigration officials with his car on September 4, 2025.

However, as noted at the November 10, 2025, oral argument, Mr. Blandon-Saavedra has offered a differing version of events since his arrest and before his initial appearance. From the first opportunity to state his version of the events, he has steadfastly maintained his car was struck by the immigration officials by their cars. *See* ECF No. 54, citing Bates 15-16.

Indeed, at the September 4, 2025, detention hearing, the government argued for Mr. Blandon-Saavedra's pretrial detention, proffering the

Complaint, featuring the damaged vehicle listed in count two. *See* ECF No. 53, September 4, 2025, Audio File I, at 4:28. The government argued that it:

> [H]as concerns as to both flight and danger as to this defendant, um, primarily regarding the actual underlying conduct in the instant case. Uh, your Honor [(Magistrate Judge Sheri Pym)] is the one who signed the affidavit, so I'm sure the Court's familiar with the facts, but in sum, the defendant when, uh, immigration authorities tried to apprehend him during a planned operation *boxed in his vehicle*, and the defendant rather than, uh, submit to those authorities, backed up and hit the first vehicle that was parked behind him that has the lights activated and then continued to pull forward and hit the car in front of him, and then at that point did not, uh, get out of his car per instructions and they had to break, uh, one of the windows of his vehicle. Obviously that creates a danger to law enforcement and shows, um, should he not appear in the future, should officers try to need, or should officers need to try to [] apprehend him in the future for failure to appear.

*Id.* at 4:41-5:40 (emphasis added).

The defense responded:

> [L]ooking at the incident, and this is very concerning and I feel like it should shock, the conscious of the Court is ICE agents plan to arrest my client, [and] instead of going to his house, they waited for him to leave to work, boxed him in the front and back as visible in the [Complaint] and weren't wearing masks.

*Id.* at 6:33-7:32.

To which the government responded:

4

Um, there were, uh, numerous representations as to the tactics used by authorities to try to apprehend [Defendant]. Um, the government, uh, disagrees with those representations as to both their appropriateness and the nature of which, uh, how they took place.

*Id.* at 9:43-10:55.

The Court, Magistrate Judge Sheri Pym, acknowledged the differing factual narratives:

So, so here, I mean, looking at this, obviously I did review the Complaint. It's, um, in terms of what's alleged here, um, you know, it's a serious matter to essentially try, you know, what's, what's alleged here is, is essentially you, there are lights activated, even though these are unmarked vehicles. The idea is that the lights would be visible. It's hard to tell from these photos whether that's the case or not, but that, um, that the defendant should have known he was being pulled over by law enforcement. And then when he realized he was trapped, he sort of tried to smash his way out of it. Maybe in a panic, maybe, you know, I, I don't know. Um, at the same time, I, you know, there are, there are questions raised by this about whether this is a case that could be defensible, because if, if it really was not apparent to him that he was, uh, that it was necessarily law enforcement, particularly, I understand from the Complaint that the, um, officers were in uniform, but that may not have been apparent, uh, until they stepped out of the vehicle. . . .

So it's, it's hard to know based on what's what I see here, you know, what was in his mind at the time. Um, and it's a case that, you know, it, it *could have been confusion, it could have been very*

5

*deliberate.* And, um, certainly there's no excuse for anybody knowingly trying to, you know, essentially smash their car into a law enforcement car. *So, um, it's, it's, I'm sort of left with the facts that there are, it can be interpreted in different ways and certainly it's not my place here to make that determination. I haven't seen video. I, I don't know what, um, a fact finder would ultimately determine in this case.*

*Id.* at 11:06-13:11 (emphasis added).

It is not common for a magistrate judge at the outset, presiding over criminal duty, to opine that a matter is both defensible and can be interpreted in different ways – confusion or deliberate acts. If the conflicting narrative was apparent then to a neutral decision maker, the state of the damaged vehicles was of apparent exculpatory value to the government as well from September 4, 2025. The first time, from a simple review of the Complaint and the attending argument, the government's theory of the case was subjected to adversarial scrutiny, Magistrate Judge Pym concluded the case was factually defendable and debatable. The government knew this but took no steps to preserve the critical piece of evidence in count two.

## **Pattern and Practice**

There has been a veritable surge in charged assaults arising under 18 U.S.C. § 111(a), (b) across the federal districts in the last several months. And, many of the cases share basic factual similarities to this matter. The defense has offered *United States v. Castillo-Ortega*, 5:25-cr-00261-JGB (C.D. Cal. 2025), but the cases nationally are legion. Consider the following language from a recent federal complaint.

The HSI Special Agents stated that at approximately 9:45 AM on August 4th, 2025, the two HSI SAs and the TFO attempted to conduct a vehicle stop of the box truck at the intersection of E.

6

47th Avenue and Lincoln Street, Denver, CO, *by surrounding the box truck* with their law enforcement vehicles and activating their emergency lights. After surrounding the box truck, one of the HSI SAs exited their vehicle wearing their law enforcement vest bearing "HSI" patches and a gold badge at the base of the vest's left shoulder strap. The box truck then reversed, accelerated, and rammed into one of the SA's vehicles, driving the SA's vehicle backwards several feet. This created enough space for the box truck to then drive forward, where it proceeded to crash into the HSI TFO's vehicle before driving away. Both the SA and TFO were inside their vehicles at the time the box truck struck them. . . . One TFO stated that [the defendant's] license photo resembled that of the driver who rammed his vehicle.

*United States v. Guevara-Ortiz*; 1:25-CR-263, ECF No. 1 at 3. (D. Colo. 2025). And, consider the following:

HSI SA returned to his vehicle and pulled up approximately a car length behind QUINTANILLA's vehicle to block him from reversing to flee the area. HSI SA put his vehicle in park. At that moment, QUINTANILLA put his car in reverse, ramming the HSI SA's vehicle. The HSI SA was forced to quickly move out of the way so he would not be injured by QUINTANILLA's reversing vehicle, being used as a deadly weapon. The trailer attached to QUINTANILLA's vehicle collided with the front of HSI SA's vehicle. HSI SA approached the driver's side of QUINTANILLA's vehicle, removed broken glass from with window, and opened the door from the inside to remove QUINTANILLA. ICE-ERO gave QUINTANILLA multiple verbal commands to exit the vehicle and attempted to pull QUINTANILLA from the vehicle.

7

QUINTANILLA refused to exit the vehicle and resisted ICE-ERO's attempts to extract him from the vehicle. TxDPS CID SA's quickly approached the vehicle and assisted in removing QUINTANILLA from the vehicle and restrained him in handcuffs. QUINTANILLA fought the law enforcement officers and forcibly, resisted, opposed, impeded, and interfered with official law enforcement duties.

*United States v. Quintanilla-Chavez*, 5:25-cr-388, ECF No. 1 at 3 (W.D. Tex. 2025); *see also United States v. Martinez*, 1:25-cr-00636, ECF No. 1 at 6 (N.D. Ill.) (charging counts of § 111(a), (b), and like here, offering photos of the damaged immigration vehicles as evidence of the assault); *see also United States v. Rendon*, 2:25-mj-03691-DUTY, ECF No. 1 (C.D. Cal. 2025) (describing an auto collision between the defendant and immigration officials); s*ee also United States v. Hernandez*, 2:25-mj-03691-DUTY, ECF No. 1 (C.D. Cal. 2025) (claimed intentional collision between defendant and a Border Patrol agent).

This case is part and parcel of a pattern demonstrating both a national surge in cases arising under § 111(a), (b), and criminal matters stemming from aggressive tactics used by immigration officials to apprehend people of interest for removal. This includes a national trend in the regular use of boxing in motorists from all sides, a tactic rarely if ever used by local, state, or other federal criminal law enforcement.

This is offered to demonstrate that it is bad faith for the government to increasingly use aggressive auto-based modalities of apprehension, but simultaneously have its vehicles hastily repaired. In early January of 2025, there was not the same or even similar spate of federal matters pending nationally stemming from auto collisions between motorists and executive branch, immigration officials attempting to apprehend people for

8

immigration removal proceedings. If immigration officials increasingly use box-in tactics, it is likely to suffer vehicle damage from intentional or unintentional acts of the affected defendants. If the government seeks to use these tactics in immigration enforcement and bring criminal cases related to the regular employment of those aggressive tactics, it must preserve all evidence showing that it may have been the very tactics themselves that caused the auto accidents. As noted in *Quintanilla-Chavez*, § 111 conduct is "unsupported" when the facts show the "immigration officer manufactur[ed] [the] felony." 5:25-cr-388, ECF No. 64 at 37, 38, 39 (citing case law reasoning that physical contact initiated "by an arresting officer is not forcibly initiated by the defendant and thus is not proscribed by" § 111. The Court dismissed the § 111 indictment in this case because the government's conduct of, in part, "break[ing] car windows first and ask[ing] questions later [pursuant to an admitted HSI] policy represent[ed] the rare case in which the [g]overnment's conduct is so shocking to the universal sense of justice that it [resulted in the government's loss] of the opportunity to prosecute . . . ."

## II. Argument

### A. The vehicle at issue was material and exculpatory.

The Court can stop at this portion of the analysis without wading into good faith. For the reasons previously briefed and argued at the November 10, 2025, hearing, the defense maintains that the destroyed vehicle in count two was material and exculpatory.

### B. The vehicle was potentially useful.

The government did not respond to the useful evidence spoliation analysis in its brief and effectively conceded the issue at the November 10, 2025, oral argument. *See e.g.*, November 10, 2025, Audio File II at 42:25 (government counsel stating, "I do agree and I do concede that I, that the evidence in this case could potentially be useful for defense attorney.").

9

1  **C. No comparable evidence exists.**

2    There is no comparable evidence in this case; it has been destroyed

3  because it has been repaired. The *Cooper* case illustrates this point. *See*

4  *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993). Not only were photos

5  not a suitable substitute source of comparable evidence in that case to the

6  destroyed evidence, but the material loss was based on the support the

7  destroyed evidence had in bolstering the defense's factual claim of innocence.

8  983 F.2d at 932. In effect, the destroyed evidence would "cheat" the defense.

9  *Id.* As noted in *Cooper*, two outcomes concomitant to the lost evidence – one

10  inculpatory and one exculpatory – demonstrates materiality and the need to

11  preserve the evidence. *See e.g. id.*, at 933 (the Ninth Circuit stating

12  "[Defendants] might be lying; weighty, exculpatory evidence might never

13  have existed. If it did not exist, the stipulation certainly would put them in a

14  better position. . . . We will not adopt the government's belief that they are

15  lying. The defendants . . . should not be made to suffer because government

16  agents discounted their version" and lost evidence).

17    At the November 10, 2025, oral argument, the government claimed that

18  *Cooper* did not address the issue of comparable evidence in a spoliation

19  analysis. *See e.g.*, Audio File II at 41:101 (government counsel arguing that

20  "[s]o that was the issue in *Cooper*, is that the government specifically acted

21  in bad faith, not that there was no comparable evidence . . . ."). The case

22  extensively addressed the comparable evidence standard, and to that end,

23  the government's argument there was that the district court erred in finding

24  no comparable evidence. *See e.g.*, 983 F.2d at 931 ("The government

25  challenges the district court's determination that Cooper and Gammill could

26  not reasonably obtain evidence comparable in value to the destroyed

27  laboratory equipment"); *see also* 983 F.2d at 932 ("The government contends

28  that Cooper and Gammill would be able to obtain comparable evidence by

other reasonably available means" and the government's argument failed because the government "ha[d] not suggested any reasonably available evidence which would be comparable to the destroyed lab equipment.").

### D. The government did not act in good faith.

The government's November 10, 2025, oral argument was self-refuting. The government argued that "the reason [it] never asked the agents to preserve the vehicle[s] in this particular case is because the Due Process, Clause does not impose on the government an undifferentiated and absolute duty to retain and preserve all material that might be of *conceivable* evidentiary significance in a particular prosecution."). Audio File II at 29:36 (emphasis added)[1] However, the government paradoxically conceded at the hearing that the unrepaired vehicle was useful to a defense. *See e.g.*, *id.* at 42:25. Taken to its logical end, the government's argument is that it did not need to preserve evidence it acknowledged was potentially useful. The binding precedent does not support the government's claim of such a meek discovery duty. If the Court wades into good faith, the government's cavalier decision to not request preservation of uncontroverted useful evidence demonstrates the very "conscious effort to suppress exculpatory evidence" *California v. Trombetta*, 467 U.S. 479 (1984), cautions against.

Last, the government argues that "Rule 16 does not kick in until indictment." Audio File II at 47:34. Federal Rule of Criminal Procedure 16 attaches when the defense requests discovery, and as stated in Rule 16(a)(1)(A), a defendant's statements *must* be produced *before* or *after* his or her arrest when requested when the government intends to use such discovery in its case in chief; pre-arrest certainly antedates an indictment

---

[1] The Audio File time stamps are based on the audio file software the defense team used to listen to, and review, the recordings.

return and arraignment. The government's logic would preclude discovery disclosure of material evidence (Rule 16 materiality) until well after a case has started through a complaint. Federal Rule of Criminal Procedure 16.1 provides *that no later* than 14-days after the indictment arraignment, the parties should endeavor to create a workable discovery production plan, but the discovery demand from defense may certainly come before 14-days after an indictment arraignment, and the government must produce discovery at that point if responsive and to which it intends to use.

All that buries the lede. Even assuming the government's unsupported reading of Rule 16 applies, the government offered to make matters available for inspection *after* the September 30, 2025, indictment arraignment, on October 1, 2025. And, at that time, it did not represent it misapprehended its duty to make the vehicles at issue – those featured in its Complaint and argued at the detention hearing – available for inspection. Indeed, as late as on October 27, 2025, it stated it would make the vehicles available for inspection. The Court should reject the government's post-hoc justifications. The defense's discovery demand was plainly made pursuant to Rule 16(a)(1)(E). Indeed, the government's claim of not understanding the scope of the defense's discovery demand is undermined by its representation that the reason it did not seek preservation was not based on confusion, but because it believed it need not preserve every conceivable source of evidence, including uncontested useful evidence. The Court need go no further than the government's own contorted representations at the November 10, 2025, oral agreement to render a bad faith finding.

## Conclusion

For these reasons, and in the interest of justice, Mr. Blandon-Saavedra respectfully requests that the Court formally issue its tentative ruling dismissing Count two of the indictment.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: November 12, 2025  By /s/ Chad Pennington

CHAD PENNINGTON
Deputy Federal Public Defender

## CERTIFICATE OF COMPLIANCE AND DECLARATION

I, Chad Pennington, counsel of record for the defendant, certify that this filing complies with the requirements of L.R. 11-6.1.

I, Chad Pennington, counsel of record, further certified under penalty of perjury that the representations in this filing are true and accurate.